**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERT MONTOUR, an individual; TINA MONTOUR, an individual, *Plaintiffs-Appellants,* <br><br> v. <br><br> HARTFORD LIFE & ACCIDENT INSURANCE COMPANY, a Connecticut Corporation, *Defendant-Appellee.* | No. 08-55803 <br><br> D.C. No. 2:07-cv-05215-DSF-RZ <br><br> ORDER AMENDING OPINION AND DENYING PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC AND AMENDED OPINION |

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
June 1, 2009—Pasadena, California

Filed September 14, 2009
Amended November 19, 2009

Before: William A. Fletcher, Richard R. Clifton and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Clifton

15367

**COUNSEL**

Bradley P. Knypstra, Knypstra & Associates, Irvine, California, for the plaintiffs-appellants.

Bruce D. Celebrezze, Dennis G. Rolstad (argued) and Erin A. Cornell, Sedgwick, Detert, Moran & Arnold LLP, San Francisco, California, for the defendant-appellee.

**ORDER**

The opinion in this case, filed September 14, 2009, is amended by revising the first sentence of the paragraph that starts at the bottom of page 13360 of the slip opinion and extends onto page 13361. The sentence previously started:

In clarifying the standard of review, *Abatie* also abrogated a line of cases, including *Jordan v. Northrop Grumman Corporation Welfare Benefit Plan*, 370 F.3d 869 (9th Cir. 2004), and *Bendixen v. Standard Insurance Company*, 185 F.3d 939 (9th Cir. 1999), that had directed reviewing courts . . . .

That sentence is amended as follows:

In clarifying the standard of review, *Abatie* abrogated a line of cases, including *Jordan v. Northrop Grumman Corporation Welfare Benefit Plan*, 370 F.3d 869 (9th Cir. 2004), and *Bendixen v. Standard Insurance Company*, 185 F.3d 939 (9th Cir. 1999), to the extent that the cases directed reviewing courts . . . .

With this amendment, the panel has voted to deny the petition for rehearing and petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote on it. Fed. R. App. P. 35.

The petition for rehearing and petition for rehearing en banc, filed October 13, 2009, are DENIED. No further petitions for rehearing or for rehearing en banc may be filed.

---

## OPINION

CLIFTON, Circuit Judge:

This case presents the question of how a district court should apply the abuse of discretion standard when reviewing a decision by the administrator of an employee benefits plan governed by the Employee Retirement Income Security Act

of 1974 (ERISA), 88 Stat. 829, as amended, 29 U.S.C. §§ 1001-1461, when that administrator has a conflict of interest. We conclude that a reviewing court must take into account the conflict and that this necessarily entails a more complex application of the abuse of discretion standard. Specifically, a modicum of evidence in the record supporting the administrator's decision will not alone suffice in the face of such a conflict, since this more traditional application of the abuse of discretion standard allows no room for weighing the extent to which the administrator's decision may have been motivated by improper considerations.

Robert Montour appeals the district court's order granting summary judgment in favor of Hartford Life and Accident Insurance Company in his action challenging Hartford's decision to terminate his long-term disability benefits as an abuse of its discretion. We reverse and, applying the proper standard of review to the facts of this case, conclude that Hartford abused its discretion because its conflict of interest too heavily influenced its termination decision. Accordingly, we remand to the district court for an order reinstating Montour's long-term disability benefits.

## I.    Background

As an employee of Conexant Systems, Inc. for approximately thirty-seven years, Montour participated in his employer's group long-term disability insurance plan, which is a welfare benefit plan governed by ERISA. Hartford is both the insurer and the administrator of the Plan. The Plan grants Hartford, as the administrator, discretionary authority to interpret Plan terms and to determine eligibility for benefits,[1] and

---

[1]Specifically, the policy provides:

**Who interprets policy terms and conditions?**

We [Hartford] have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.

it places the burden of proving both initial and ongoing disability on the claimant.

In July 2003 Montour took a medical leave of absence from his position as a telecommunications manager after developing symptoms of acute stress disorder. At the time, he was fifty-five years old. In January 2004, following a period of 180 days during which no benefits were payable under the Plan, Hartford accepted Montour's application for benefits under the Plan and began paying him disability benefits.

At the outset of his psychiatric illness, Montour consulted several times with his primary care physician, Dr. Samuel Park. In September 2003 he began regular psychotherapy sessions with a psychiatrist. His last documented psychotherapy session took place in April 2005.

Meanwhile, in June 2004 Montour consulted Dr. Kenneth Kengla, an orthopedic surgeon, about pain in his right knee and his lower back. Dr. Kengla diagnosed Montour with degenerative changes in both regions and notified Hartford in September 2004 that Montour was at that time also suffering from *physical* disability that prevented him from returning to the labor force. In October 2004 Dr. Kengla performed arthroscopic surgery on Montour's right knee. The subject of Montour's back condition did not come up again during their consultations until April 2005. Subsequently, Montour consulted Dr. Kengla about his back pain during appointments in December 2005 and May 2006.

Dr. Kengla consistently maintained to Hartford that Montour remained physically disabled and unable to work in any job as a result of his back and knee impairments. Specifically, he listed the following restrictions on Montour's physical activities: 1) "no sitting for more than 15-20 min[utes] at a time"; 2) "no prolonged walking"; 3) "no standing greater than 15 min[utes] at a time"; 4) "no lifting or carrying greater than 10 [pounds;]" 4) "no work at or above shoulder level";

5) "no moderate pushing activities"; 6) "no moderate pulling activities"; and 7) "no driving greater than 30 min[utes] at a time."

In November and December 2005 Hartford hired two outside companies to conduct surveillance on Montour over the course of four nonconsecutive days. Video footage from this surveillance depicted Montour driving his car to perform occasional errands, such as picking up his grandchildren from school, going to the pharmacy, and getting a haircut. He was observed once bending at the waist to reach into his car.

In March 2006 a Hartford investigator conducted a personal interview with Montour at his home, during which Montour listed a "bad back, [an] arthritic right knee, and sleep apnea" as the "disabling medical condition(s)" preventing him from returning to work. He also described an inability to concentrate, which he attributed to the medication he must take to treat his "constant pain." The investigator observed that Montour remained alert and responsive during the entire four-and-a-half hour interview, although he called the investigator by the wrong name about two hours into the interview. Montour acknowledged that the surveillance video footage accurately depicted his level of functionality. He was physically able to complete the interview, but he demonstrated signs of pain in front of the investigator, such as moaning when he stood up or twisted, walking around his house stiffly with a slight limp, and complaining of back pain three times during the final two hours.

In May 2006 a Hartford nurse case manager submitted letters to Dr. Kengla and Dr. Park surmising that Montour was capable of performing "sedentary to light" work and soliciting their agreement. Dr. Park signed and returned the letter, which signified that he either agreed or found "no contraindications to this work capacity level." Dr. Kengla, on the other hand, indicated that he disagreed with Hartford's conclusions, citing

Montour's persistent orthopedic symptoms and physical restrictions.

In July 2006 Hartford hired a consulting physician, Dr. Gale Brown, to conduct a file review. Dr. Brown analyzed Montour's medical records for the 2003-2006 period, including X-rays and MRIs of Montour's lower back taken in June 2004 and May 2006, Montour's pharmacy records for the 2004-2006 period, Hartford's surveillance video and accompanying reports, and the personal interview report. He also spoke with Dr. Kengla on the phone. Dr. Brown concluded that medical evidence supported the existence of a lower back condition called "degenerative spondylostenosis/DDD" but that Dr. Kengla's offered restrictions were excessive for this "mild to moderate" condition and understated Montour's demonstrated and admitted physical abilities. Dr. Brown acknowledged that medical evidence supported Montour's chronic pain but found that Montour was nevertheless capable of working full-time with modest restrictions, such as changing positions every thirty to forty-five minutes.

Hartford next enlisted a vocational rehabilitation expert to compile an Employability Analysis Report, which evaluated Montour's experience, qualifications, and the physical restrictions identified by Dr. Brown. That expert concluded that Montour was capable of working in a high-level managerial capacity in five different fields.

In August 2006 Hartford informed Montour of its decision to terminate his benefits in light of its conclusion that he no longer met the policy's definition of disability. Montour appealed this decision internally and included a vocational appraisal report by Gene Bruno. The Bruno report concluded that Montour was "not employable in any setting" and that Hartford's decision was based on numerous mistakes, including a disregard for the fact that the Social Security Administration (SSA) considered Montour to be "totally disabled."

In response, Hartford hired Dr. Renat Sukhov to conduct a second file review. Dr. Sukhov reviewed Montour's records for evidence of a physical condition that would preclude sedentary work and, like Dr. Brown, found none. He noted in particular a lack of objective, clinical data demonstrating the extent to which Montour's pain impacted his functionality. He also noted that Montour's activities depicted on the surveillance videos exceed the activity requirements of a sedentary job. Dr. Sukhov concluded that Montour could work, at minimum, in a sedentary job with reasonable restrictions, such as avoiding static work posture, not lifting objects weighing more than twenty pounds, and not pushing or pulling loads weighing more than thirty to thirty-five pounds.

In light of concerns raised in the Bruno report, Hartford also requested a vocational specialist to conduct an Employability Analysis Report addendum, which reached the same conclusion as the Employability Analysis Report regarding the sedentary nature and thus the feasibility of the five proposed managerial positions. In February 2007 a Hartford appeal specialist affirmed the company's previous decision to terminate Montour's benefits.

Having exhausted his administrative remedies, in June 2007 Montour and his wife, Tina Montour, filed suit against Hartford in California Superior Court to recover benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). The complaint also alleged breach of fiduciary duty, promissory estoppel, invasion of privacy, intentional infliction of emotional distress, and loss of consortium. Hartford removed the case to the Central District of California and promptly moved to dismiss. The district court dismissed the causes of action for breach of fiduciary duty and promissory estoppel, remanded the claims for invasion of privacy, intentional infliction of emotional distress, and loss of consortium back to state court, and proceeded to hold a bench trial on the administrative record for the remaining ERISA benefits recovery claim.

In April 2008 the court entered its Findings of Fact and Conclusions of Law ordering Judgment in favor of Hartford. The district court concluded that although Hartford had a structural conflict of interest in its position as both the administrator of the insurance policy and the payor of benefits, it did not abuse its discretion in determining that Montour failed to provide sufficient evidence to demonstrate disability within the meaning of the policy.

Montour timely appealed.

## II.   Standard of Review

The district court's findings of fact in a bench trial on the administrative record are reviewed under the clearly erroneous standard. *See Pannebecker v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1213, 1217 (9th Cir. 2008); *see also Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 & n.6 (9th Cir. 1999) (en banc). In contrast, we review "a district court's choice and application of the appropriate standard for reviewing benefits decisions by an ERISA plan administrator" de novo. *Sznewajs v. U.S. Bancorp Amended & Restated Supplemental Benefits Plan*, 572 F.3d 727, 732 (9th Cir. 2009) (internal quotation marks omitted).

As for review of a plan administrator's decision, "[t]he Supreme Court has held that a denial of benefits 'is to be reviewed under a de novo standard unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan.' " *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1023 (9th Cir. 2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Where, as here, the plan "does grant such discretionary authority, we review the administrator's decision for abuse of discretion." *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866 (9th Cir. 2008). The manner in which a reviewing court applies the abuse of discretion stan-

dard, however, depends on whether the administrator has a conflicting interest.

**[1]** In the absence of a conflict, judicial review of a plan administrator's benefits determination involves a straightforward application of the abuse of discretion standard. *See Sznewajs*, 572 F.3d at 733-35; *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178-79 (9th Cir. 2005). In these circumstances, the plan administrator's decision can be upheld if it is "grounded on *any* reasonable basis." *See Sznewajs*, 572 F.3d at 734-35 (internal quotation marks omitted). In other words, where there is no risk of bias on the part of the administrator, the existence of a "single persuasive medical opinion" supporting the administrator's decision can be sufficient to affirm, so long as the administrator does not construe the language of the plan unreasonably or render its decision without explanation. *See Boyd*, 410 F.3d at 1179; *see also Sznewajs* 572 F.3d at 733-35.

**[2]** Commonly, however, the same entity that funds an ERISA benefits plan also evaluates claims, as is the case here. *See Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346, 2348 (2008) ("*MetLife II*").² Under these circumstances, the plan administrator faces a structural conflict of interest: since it is also the insurer, benefits are paid out of the administrator's own pocket, so by denying benefits, the administrator retains money for itself. Application of the abuse of discretion standard therefore requires a more complex analysis. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006) (en banc) ("[T]he existence of a conflict of interest is relevant to *how* a court conducts abuse of discretion review." (emphasis added)). Simply construing the terms of the underlying plan and scanning the record for medical evidence supporting the plan administrator's decision is not enough, because a reviewing court must take into account the adminis-

---

²We refer to the Supreme Court's decision as "*MetLife II*" because we also reference the lower court's opinion, *infra*, which *MetLife II* affirmed.

trator's conflict of interest as a factor in the analysis. *See MetLife II*, 128 S. Ct. at 2346, 2348, 2350; *Abatie*, *458 F.3d at 968-69.*

[3] More particularly, the court must consider numerous case-specific factors, including the administrator's conflict of interest, and reach a decision as to whether discretion has been abused by weighing and balancing those factors together. *See MetLife II*, 128 S. Ct. at 2351-52 (describing the garden variety "combination-of-factors method of review"). Under this rubric, the extent to which a conflict of interest appears to have motivated an administrator's decision is one among potentially many relevant factors that must be considered. Other factors that frequently arise in the ERISA context include the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts "with all of the relevant evidence[,]" and whether the administrator considered a contrary SSA disability determination, if any.[3] *See MetLife II*, 128 S. Ct. at 2352; *see also Saffon*, 522 F.3d at 869-73.

The weight the court assigns to the conflict factor depends on the facts and circumstances of each particular case. For example, the Supreme Court has explained that this factor

> should prove more important (perhaps of great importance) where *circumstances suggest a higher*

---

[3]For example, in *MetLife II* the Supreme Court endorsed the approach taken by the Sixth Circuit, which weighed three factors, namely, the medical evidence, a contrary SSA disability determination, and the administrator's inherent conflict of interest, and ultimately concluded that the administrator had abused its discretion in denying benefits to the claimant. *See Glenn v. MetLife*, 461 F.3d 660, 666-74 (6th Cir. 2006) ("*MetLife I*"), *aff'd by MetLife II*, 128 S. Ct. at 2351-52 (finding "nothing improper in the way in which the [Sixth Circuit] conducted its review").

> *likelihood that it affected the benefits decision*, including, *but not limited to*, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*MetLife II*, 128 S. Ct. at 2351 (internal citation omitted and emphases added); *see also Abatie*, 458 F.3d at 967 (holding that in weighing a conflict of interest, the court's discretionary review must be "informed by the nature, extent, and effect" that conflict may have had "on the decision-making process").

Our court has implemented this approach by including the existence of a conflict as a factor to be weighed, adjusting the weight given that factor based on the degree to which the conflict appears improperly to have influenced a plan administrator's decision. *See Abatie*, 458 F.3d at 968; *see also Nolan v. Heald College*, 551 F.3d 1148, 1153-54 (9th Cir. 2009); *Saffon*, 522 F.3d at 867-68. These cases should not be mistaken to imply that the existence of a conflict of interest alters the standard of review itself, rather than merely its application. As *Abatie* explicitly held, if a conflict of interest exists, "abuse of discretion review applies" and "that conflict must be weighed as a factor in determining whether there is an abuse of discretion." 458 F.3d at 965 (internal quotation marks and alteration omitted). In fact, *Abatie* "conscious[ly] reject[ed]" the "sliding scale metaphor" that some other circuits had adopted, which involved adjusting the level of "deference" or "scrutiny" in the standard of review itself in proportion to the "seriousness of the conflict." *Id.* at 967 (internal quotation marks omitted); *see also id.* at 968 ("[I]n any given case, all the facts and circumstances must be con-

sidered, and nothing 'slides[.]' "). This comports with the Supreme Court's more recent pronouncement "that a reviewing court should consider [a] conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits[,] and that the significance of the factor will depend upon the circumstances of the particular case." *MetLife II*, 128 S. Ct. at 2346.

**[4]** In any event, *Abatie* explained that the court should adjust the level of skepticism with which it reviews a potentially biased plan administrator's explanation for its decision in accordance with the facts and circumstances of the case. *See* 458 F.3d at 969; *see also Saffon*, 522 F.3d at 868. If those facts and circumstances indicate the conflict may have tainted the entire administrative decisionmaking process, the court should review the administrator's stated bases for its decision with enhanced skepticism: this is functionally equivalent to assigning greater weight to the conflict of interest as a factor in the overall analysis of whether an abuse of discretion occurred.

**[5]** In clarifying the standard of review, *Abatie* abrogated a line of cases, including *Jordan v. Northrop Grumman Corporation Welfare Benefit Plan*, 370 F.3d 869 (9th Cir. 2004), and *Bendixen v. Standard Insurance Company*, 185 F.3d 939 (9th Cir. 1999), to the extent that the cases directed reviewing courts to disregard structural conflicts of interest and affirm an administrative decision "grounded on *any* reasonable basis," unless a plaintiff could produce sufficient evidence that the conflict was "serious." *See Abatie*, 458 F.3d at 966-67, 969. This more traditional application of the abuse of discretion standard allowed no room for a reviewing court to factor the existence of a conflict of interest into the analysis. *See Jordan*, 370 F.3d at 878-80; *Bendixen*, 185 F.3d at 944. In the wake of *Abatie*, therefore, the traditional application of administrative discretionary review that our court still applies in cases where no conflict exists does not apply to the review of a decision by an inherently conflicted plan administrator.

*See, e.g.*, *Sznewajs*, 572 F.3d at 734-36 (holding that "[u]nder the deferential standard which courts must use to review the administrator's interpretation *in the absence of any evidence of conflict of interest*," the "plan administrator's decision to deny benefits must be upheld under the abuse of discretion standard if it is based upon a reasonable interpretation of the plan's terms and if it was made in good faith" (internal quotation marks omitted and emphasis added)).

For this reason, the district court's reliance in this case on *Boyd*, another decision in which there was apparently no evidence of a conflict of interest, was incorrect. *See* 410 F.3d at 1178-79. The district court acknowledged there were "signs of bias in Hartford's determination" but, applying *Boyd*, deemed itself capable of reversing Hartford's decision as an abuse of discretion "*only* . . . if it [found] clear error in Hartford's determination" that Montour failed to provide sufficient evidence to demonstrate his disability. (Emphasis added.) While the district court found that Hartford's conflict of interest tainted much of the administrative decisionmaking process, its "analysis of the plan administrator's basis for terminating benefits does not include any discussion of the role that . . . conflict of interest may have played in [Hartford]'s decision nor appear to give that conflict any weight." *MetLife I*, 461 F.3d at 666. Likewise, the court acknowledged the dissonance between the SSA's disability determination and Hartford's contrary conclusion, but it does not appear to have given this factor adequate consideration or weighed it against other factors. Instead, the court relied on *Boyd*, a case involving no conflict and thus a less complex application of the abuse of discretion standard, to conclude that no abuse of discretion occurred because the record contained *some* medical evidence supporting Hartford's decision to deny benefits. In fact, the language of the district court's decision suggests that because of that evidence, the court felt itself obliged to affirm, irrespective of any taint. After *Abatie*, this is incorrect.

**[6]** As the district court's decision did not appropriately balance the pertinent factors, and in particular the conflict factor, we proceed to do so here. Judicial review of an ERISA plan administrator's decision on the merits is limited to the administrative record,[4] so "we are in the same position as the district court . . . ." *See Moapa Band of Paiute Indians v. U.S. Dep't of Interior*, 747 F.2d 563, 565 (9th Cir. 1984); *see also, e.g.*, *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1114-15 (9th Cir. 2007) (reaching the merits in a case requiring administrative record review because the court of appeals faced the same task as the district court did). Therefore, while we accept the district court's factual findings, we apply the standard of review de novo. *See Ramstad v. Hodel*, 756 F.2d 1379, 1382 (9th Cir. 1985).

## III.    The Merits

**[7]** We begin with the district court's comprehensive description of the "signs of bias" exhibited by Hartford throughout its decisionmaking process:

> Hartford was both the plan administrator and funder of the Plan, and evidence of this conflict of interest appears throughout the record. For example, in its letters to Plaintiff, Hartford overstates and over-relies on surveillance of Plaintiff. Plaintiff was observed over forty daylight hours on four days in November and December 2005. During this time, he was observed making two twenty minute trips to pick up or drop off his grandchildren from school and one trip of about two and a half hours conducting errands at various stores. He was also observed to be away from his home on two occasions for

---

[4]In the ERISA context, the "administrative record" consists of "the papers the insurer had when it denied the claim." *See Kearney*, 175 F.3d at 1086.

about an hour and forty minutes. During this time, he was observed bending once at the waist and picking up a small bag of medication.

This observed activity was brief and consistent with Plaintiff's self-reported limitations. Plaintiff admitted that he was able to drive for up to thirty minutes, could walk short distances, and could lift objects lighter than five pounds. Yet Hartford claimed that Plaintiff's "self-reported limitations were not consistent with his observed activities." Hartford strung together a laundry list of discrete activities observed over the course of four days, suggesting that Plaintiff was capable of sustaining those activities throughout the day, as would be required in a sedentary occupation. However, that Plaintiff could perform sedentary activities in bursts spread out over four days does not indicate that he [ ]is capable of sustaining activity in a full-time occupation.

Furthermore, despite its own internal observation that Plaintiff walked "in a slightly stiff and slow manner" and entered his car in "a somewhat slow and deliberate manner", Hartford indicates that Plaintiff "did not show any limitation in his movement and demonstrated no sign of physical distress." This statement is also inconsistent with Hartford's report on the in-home interview, which noted that Plaintiff showed signs of pain and discomfort, moaning the majority of times that he stood or twisted.

Hartford's attempts to obtain information from Plaintiff's physicians were marred by this overstatement of the surveillance findings, as well as apparent advocacy for the position that Plaintiff was not disabled. In the letter sent to Drs. Park and Kengla, Hartford again strung together discrete activities observed in short bursts over several days, stated that

he was seen "walking at a brisk pace," and noted that his activities were "performed without apparent difficulty, hesitation, or the use of assistive devices." Instead of noting the observations of pain seen during Plaintiff's in-home interview, the letter stated that Plaintiff "displayed minimal physical or mental limitation" while participating in the interview.

In response to this letter, Dr. Park, who saw Plaintiff twice a year and was not treating him for his back condition, stated that he either agreed or found no contraindication to the sedentary work capacity suggested by Hartford. Dr. Kengla, who saw Plaintiff once a month for the conditions that rendered him disabled, stated that Plaintiff remained disabled. Dr. Park was apparently less familiar with Plaintiff's condition and thus more apt to be swayed by Hartford's slanted presentation of the facts. Nonetheless, Hartford found the disagreement between Dr. Park and Dr. Kengla to be significant, and sent Plaintiff's file to Dr. Brown for independent review.

Although he based his opinion on a number of factors, Dr. Brown relied on both the surveillance and the conflict of opinion between Drs. Park and Kengla in reaching the conclusion that Plaintiff was able to return to work. In conducting a further review of Plaintiff's medical records after Plaintiff appealed the denial of benefits, Dr. Sukhov again overemphasized the surveillance, stating that the "video clearly shows the claimant performing activities above those required for a sedentary job." As noted above, this was clearly not the case.

Thus, there is a common theme, both in Hartford's communications with Plaintiff and in the assessments of those professionals Hartford hired to evaluate Plaintiff's condition, of presenting evidence of

> capability in the best possible light, while failing to subject evidence of capability to the same skepticism and rigorous analysis applied to evidence of disability.

(Alterations and internal citations omitted). In other words, Hartford's bias infiltrated the entire administrative decision-making process, which leads us to accord significant weight to the conflict.

**[8]** Another factor is Hartford's failure to present extrinsic evidence of any effort on its part to "assure accurate claims assessment[,]" such as utilizing procedures to help ensure a neutral review process. *See MetLife II*, 128 S. Ct. at 2351. To the contrary, in fact, Hartford's nurse case manager took an advocacy position in her letters to Montour's physicians soliciting their agreement with her disability conclusion. While Hartford was not *required* to present evidence demonstrating its efforts to achieve claims administration neutrality, the Supreme Court's decision in *MetLife II* placed it on notice as to the potential significance of such evidence in defense of a suit by a claimant challenging an adverse benefits determination. *See id.* at 2351; *cf. id.* at 2356 (Kennedy, J., concurring in part and dissenting in part). On the other hand, Montour also did not submit any extrinsic evidence of bias, such as statistics regarding Hartford's rate of claims denials or how frequently it contracts with the file reviewers it employed in this case. *See id.* at 2351; *Abatie*, 458 F.3d at 968-69; *cf. Nolan*, 551 F.3d at 1152 & n.3.

**[9]** Another factor is Hartford's decision to conduct a "pure paper" review in this case, that is, to hire doctors to review Montour's files rather than to conduct an in-person medical evaluation of him. While the Plan does not require a physical exam by a non-treating physician, in this case that choice "raise[s] questions about the thoroughness and accuracy of the benefits determination[,]" *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008) (quotation marks

omitted), as it is not clear the Plan presented Dr. Brown and Dr. Sukhov "with all of the relevant evidence." *MetLife II*, 128 S. Ct. at 2352. Specifically, neither of Hartford's professional experts mentioned the SSA's contrary conclusion, "not even to discount or disagree with it, which indicates that [they] may not even have been aware of it." *See MetLife I*, 461 F.3d at 669 (internal quotation marks and alterations omitted).

In its decision to terminate Montour's benefits, Hartford relied significantly on the conclusions reached by Dr. Brown and Dr. Sukhov. Dr. Brown, who conducted the first file review, diagnosed Montour with a "mild to moderate" back condition that he felt should not cause Montour as much pain as he was reportedly suffering. Likewise, the second file reviewer, Dr. Sukhov, based his conclusion of non-disability in part on the lack of objective medical data to support Montour's alleged pain levels, in addition to the lack of a self-reported pain scale or some form of quantification of the impact of his pain on his functional abilities. It would probably have been unreasonable for Hartford to require Montour to produce objective proof of his pain level, per Dr. Sukhov, or to reject his subjective claims of "excess pain" based solely on Dr. Brown's observation. *See Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996); *Fair v. Bowen*, 885 F.2d 597, 601-03 (9th Cir. 1989); *see also Saffon*, 522 F.3d at 872-73 & n.3. However, Dr. Brown and Dr. Sukhov also observed that: (1) Montour's pharmacy records indicate he was using limited and relatively mild pain medication; and (2) his medical records with Dr. Kengla suggest that he had not recently engaged in any pain treatment programs. These observations probably constitute sufficient "objective" evidence to support their conclusion that Montour's pain does not rise to the level of *disabling* pain. *See Orn v. Astrue*, 495 F.3d 625, 637-38 (9th Cir. 2007); *Fair*, 885 F.2d at 602-03.

On the other hand, Dr. Sukhov also fixated on the lack of progression (*i.e.*, lack of further degeneration) in Montour's

back condition, as evidenced by X-rays and MRIs taken in June 2004 and May 2006, and Hartford noted this in its decision on appeal. It is not clear "why further degeneration is necessary to sustain a finding that [Montour] is disabled." *Saffon*, 522 F.3d at 871. Given that Hartford found Montour disabled in 2004 and paid him benefits for over two years, "[i]n order to find [him] no longer disabled, one would expect the MRIs to show an *improvement*, not a lack of degeneration." *Id.*

**[10]** One final factor is Hartford's failure to grapple with the SSA's contrary disability determination. The Plan requires claimants to apply for social security disability benefits from the SSA and, if denied, to exhaust all possible appeals. Hartford emphasized this requirement to Montour in its initial award letter and then again in a separate letter the following month. In March 2004, the SSA concluded that Montour was disabled and awarded him disability benefits retroactively to January 2004. Hartford benefitted from this award significantly, as it received a dollar-for-dollar financial offset, nearly halving its liability. As of April 2005 and December 2006, the SSA considered Montour's disability to be "continuing." In August 2006, Hartford nevertheless concluded that Montour was no longer disabled. Although Montour had immediately forwarded the SSA's April 2005 notice of continuing disability to Hartford, the plan administrator made no mention of the SSA's contrary determination in its initial termination decision. In its decision denying Montour's appeal, Hartford acknowledged the SSA's decision but did not articulate why the SSA might have reached a different conclusion. *See MetLife I*, 461 F.3d at 671 n.3 (noting that there is a distinction between *mentioning* a contrary determination and *discussing* it).

**[11]** While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was "the

product of a principled and deliberative reasoning process." *See MetLife I*, 461 F.3d at 674; *see also MetLife II*, 128 S. Ct. at 2352; *cf. id.* at 2361 (Scalia, J., dissenting). In fact, not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence. *See MetLife II*, 128 S. Ct. at 2355 (Roberts, C.J., concurring in part and concurring in the judgment).

Unlike the SSA, Hartford was not bound by the treating physician rule, which accords "special weight" to the opinions of a claimant's treating physician. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 831, 834 (2003) (holding that while ERISA administrators may not arbitrarily ignore a treating physician's opinion, that opinion also is not entitled to any "special deference"). However, this distinction alone does not provide a basis for disregarding the SSA's determination altogether, because in some cases, such as this one, the SSA deploys a more stringent standard for determining disability than does the governing ERISA plan. *See, e.g.*, *MetLife I*, 461 F.3d at 668 & n.1; *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 294 n.4 (6th Cir. 2005). Specifically, after twenty-four months the Plan defines "disability" as being prevented by, *inter alia*, accidental bodily injury or sickness from performing an essential duty of any occupation for which the claimant is "qualified by education, training or experience" that pays at least as much as the claimant would otherwise be eligible for if receiving benefits under the Plan, which consists of a formula based in part on the claimant's past earnings. The SSA's standard is more strict, defining "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical . . . impairment" that is of "such severity that [the claimant] . . . cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives." 42 U.S.C. § 423(d)(1)(A), (2)(A). In other words, unlike the Plan, the SSA's standard does not take into account a claimant's past

earnings or location. *Accord MetLife I*, 461 F.3d at 668 n.1; *cf. DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 446 (6th Cir. 2009) ("Even though [the administrator] did not have the opinion accompanying the notice of award, it still was well aware of the uniform federal standard that applies to Social Security claims.").

Ordinarily, a proper acknowledgment of a contrary SSA disability determination would entail comparing and contrasting not just the definitions employed but also the medical evidence upon which the decisionmakers relied. *See, e.g.*, *MetLife I*, 461 F.3d at 668. Unfortunately, the administrative record in this case only contains the SSA's award letters without the opinion by the SSA administrative law judge (ALJ) or the SSA administrative record on which that decision was based. This omission makes the process of comparing and contrasting the two opposing disability determinations more difficult.

Although the Plan places the burden on Montour to submit "written proof" of his disability, that is, the pertinent documents and information necessary to facilitate a disability determination, regulations promulgated by the Secretary of Labor authorize, if not require, plan administrators working with an apparently deficient administrative record to inform claimants of the deficiency and to provide them with an opportunity to resolve the problem by furnishing the missing information. *See* 29 C.F.R. § 2560.503-1(f)(3)-(4), (g)(1)(iii); *see also Saffon*, 522 F.3d at 870 ("In resolving [Montour]'s claim for benefits, [Hartford] was required to give [him] 'a description of any additional material or information' that was 'necessary' for [him] to 'perfect the claim[.]' . . ." (quoting 29 C.F.R. § 2560.503-1(g)(1)(iii) (alterations omitted))). We have also construed this regulation to require a plan administrator denying benefits in the first instance to notify the claimant not just of the opportunity for internal agency review of that decision but also of what additional information would be

necessary "to perfect the claim[.]" *Chuck v. Hewlett Packard Co.*, 455 F.3d 1026, 1032 (9th Cir. 2006).

Although the record reflects that Montour kept Hartford regularly apprised of his continuing disability status with the SSA, Hartford's initial decision in this case made no mention of the contrary SSA disability determination and did not advise Montour that further documentation, such as the ALJ's decision or the underlying administrative record, would facilitate Hartford's review. At the appeals stage, Hartford's sole acknowledgment was that the SSA's contrary determination was "a consideration and part of the totality of the evidence[,]" but it then continued with the statement that its decision "must be based on the weight of the evidence in this file . . . ."

To the extent this latter statement implies that the missing ALJ opinion and underlying record precluded Hartford from attributing much weight to the SSA's contrary determination, this information came too late. *See Chuck*, 455 F.3d at 1032; *Saffon*, 522 F.3d at 871 ("Insofar as [Hartford] believed that" additional documentation establishing the reasoning and evidence underlying the SSA's disability determination "was necessary for it to evaluate [Montour]'s claim," it should have said so "at a time when [Montour] had a fair chance to present evidence on this point."); *see also* 29 C.F.R. § 2560.503-1(h)(2)(iv) (requiring plan administrators to consider documentation submitted by a claimant at the appeal stage). Montour does not challenge the reasonableness of Hartford's claims procedures on appeal. *See* 29 C.F.R. § 2560.503-1(h)(2), (l). Nevertheless, we explained in *Abatie* that "an administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA[,]" and "[t]his procedural violation must be weighed . . . in deciding whether [the administrator] abused its discretion." 458 F.3d at 974.

Ultimately, Hartford's failure to explain why it reached a different conclusion than the SSA is yet another factor to consider in reviewing the administrator's decision for abuse of discretion, particularly where, as here, a plan administrator operating with a conflict of interest requires a claimant to apply and then benefits financially from the SSA's disability finding. *See MetLife II*, 128 S. Ct. at 2352 ("This course of events [is] not only an important factor in its own right (because it suggest[s] procedural unreasonableness), but also would . . . justif[y] the court in giving more weight to the conflict (because [Hartford]'s seemingly inconsistent positions were both financially advantageous).").

**[12]** Weighing all of the foregoing factors together, we conclude that Hartford's conflict of interest improperly motivated its decision to terminate Montour's benefits. This constituted an abuse of its administrative discretion.

## IV.  Conclusion

**[13]** We reverse the district court's summary judgment in favor of Hartford and remand to the district court to enter summary judgment in favor of Montour and to order the reinstatement of long-term disability benefits in accordance with this opinion and the terms of the Plan. *See Pannebecker*, 542 F.3d at 1221 ("[W]hether the administrator abused its discretion because the decision was substantively arbitrary or capricious, or because it failed to comply with required procedures, benefits may still be reinstated if the claimant would have continued receiving benefits absent the administrator's arbitrary and capricious conduct.").

**REVERSED and REMANDED.**