**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEFF RENFRO,

        *Plaintiff-Appellant,*

v.

THE FUNKY DOOR LONG TERM
DISABILITY PLAN and THE
SERVICEMASTER LONG TERM
DISABILITY PLAN,

        *Defendants-Appellees.*

No. 11-15301

D.C. No.
4:09-CV-02661-
SBA

OPINION

Appeal from the United States District Court
for the Northern District of California
Saundra B. Armstrong, District Judge, Presiding

Argued and Submitted
March 13, 2012—San Francisco, California

Filed June 18, 2012

Before: M. Margaret McKeown and Milan D. Smith, Jr.,
Circuit Judges, and Barbara Jacobs Rothstein,
Senior District Judge.*

Opinion by Judge Milan D. Smith, Jr.

---

*The Honorable Barbara Jacobs Rothstein, Senior District Judge for the
United States District Court for the Western District of Washington, sit-
ting by designation.

7039

**COUNSEL**

Sharon Delfino Green, William Green (argued), Jennifer de la Campa, Defino Green & Green, San Rafael, California, for plaintiff-appellant Jeff Renfro.

Kevin Gill (argued) and Anna M. Martin, Rimac Martin, PC, Incline Village, Nevada, for defendants-appellees The Funky Door Long Term Disability Plan and The ServiceMaster Long Term Disability Plan.

**OPINION**

M. SMITH, Circuit Judge:

Jeff Renfro is insured under two long-term disability plans administered by Unum Life Insurance Company (Unum), namely, the Funky Door Long Term Disability Plan (the FDP), and the ServiceMaster Long Term Disability Plan (the SMP) (the FDP and the SMP collectively, the Plans). Renfro sued the Plans when Unum decided to deduct his Social Security Disability Insurance (SSDI) benefit as deductible income under each plan, resulting in what he terms a "double offset." On cross summary judgment motions, the district court granted summary judgment in favor of the Plans, found that Unum's interpretation of the Plans was not an abuse of discretion, and held that Renfro was not entitled to recovery under a theory of equitable estoppel. Renfro appeals the judgment of the district court. Because we find that Unum's decision was not an abuse of discretion, that the plain language of the Plans permits the deduction of the SSDI benefit from each plan, and that Renfro is not entitled to equitable estoppel, we

affirm the district court's grant of summary judgment in favor of the Plans.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   The Funky Door Plan

Renfro was employed since 2002 as a yoga instructor and department manager at Funky Door Yoga, and was covered under the FDP. After he suffered an injury to his right shoulder, Renfro tendered a disability claim to Unum under the FDP. Unum approved his claim.

As required under the FDP, Renfro filed an application for SSDI benefits, on March 11, 2005. The Social Security Administration (SSA) initially denied the claim but Renfro appealed the decision. On January 19, 2007, the SSA reversed its decision, and awarded Renfro benefits, along with retroactive payments extending back to June 1, 2005, the date it determined that Renfro became disabled under SSA rules. SSA's decision indicated that Renfro would receive a retroactive payment of $25,177.00.

After learning on February 26, 2007 of the SSA's approval of SSDI benefits for Renfro, Unum began deducting the SSDI award from the monthly payment under the FDP. In addition, because the SSDI retroactive payments overlapped with a period of time Unum had covered Renfro under the plan, Unum calculated an overpayment on the plan of $24,377.78, and requested reimbursement of that amount. On March 14, 2007, Unum sent Renfro another letter indicating that Renfro had not responded to its request for reimbursement of the overpayment, and stating that it would begin applying the full amount of his monthly payment under the FDP to the repayment of Unum's overpayment, until the overpayment was recovered in full.

## II.   The ServiceMaster Plan

In addition to working at Funky Door Yoga, Renfro was also employed at ServiceMaster, as a plumbing manager. At ServiceMaster, Renfro was covered under the SMP, which, coincidentally, was also administered by Unum. As he had done under the FDP, Renfro submitted a claim under the SMP. On August 25, 2005, Unum approved Renfro's SMP claim under a Reservation of Rights. Unum's SMP approval letter to Renfro stated that it would reduce the monthly gross benefit by the estimated SSDI amount of $1801.00.

On July 21, 2006, Unum concluded that Renfro no longer met the definition of disability under the SMP, and terminated his benefits. Renfro appealed this decision, and Unum reversed itself and reinstated his benefits under the SMP. As of this time, Renfro was still covered under the FDP, and had begun receiving SSDI benefits.

## III.   Handling of the SSDI Offset

On July 19, 2007, Renfro's attorney and a Unum representative engaged in a phone conversation regarding Renfro's claims. According to the following notes of the conversation taken by the Unum representative, the parties discussed the retroactive benefits due to Renfro on the SMP based on Unum's reversal of its previous decision, the overpayment Renfro owed Unum on the FDP, and how to handle the SSDI offset:

> He asked about back pay and I advised based on our current considerations the back pay would be $51K. He asked if this was with offset, advised as the full offset is currently on the other file if all remains the way we are currently anticipating this would be the full back benefit with no further reduction for SSDI. Advised there is an overpayment on the other claim of $19297.78 that would need to be settled before

payment and this would reduce payment to [sic] 31702.22. He asked if the paperwork could note the $51K from this claim with the payment being sent to him and a check for the [sic] 31702.22. Advised that he could drop us a note and that should not be a problem. He states he just wanted to know because the insured would have owed this on the other claim regardless of the outcome on this one.

Subsequently, Unum and Renfro's attorney exchanged two letters regarding their conversation. Unum confirmed that the overpayment from the FDP would be deducted from the retroactive benefits due under the SMP, per the phone conversation. Unum also confirmed that it would not seek an additional SSDI offset from the retroactive benefits but was "continuing to evaluate both claims for consideration of offsets going forward."

On April 29, 2009, Unum sent Renfro a letter informing him of its final decision on how it would handle the offsets. In the letter, Unum explained its position that the SSDI offset was deductible under both Plans based on the contract language of both policies. However, Unum explained that because it had incorrectly calculated benefits on the SMP due to the SSDI offset, it would not seek to recover its overpayment, but would take the offset prospectively. Renfro wrote a letter to Unum objecting to the decision, and asking for a reversal of that decision. Unum rejected the appeal.

Subsequently, Renfro filed this lawsuit, seeking recovery of benefits that he alleges were wrongfully withheld, arising from Unum's deduction of the SSDI offset under both Plans. After the parties filed cross summary judgment motions, the district court handed down an order granting summary judgment in favor of the Plans. Renfro timely appeals the district court's decision.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291.

We review a district court's grant of a motion for summary judgment *de novo*. *Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1142 (9th Cir. 2002).

## DISCUSSION

### I. Deference Owed to the Plan Administrator's Decision

Before we reach the merits of Renfro's claims, we first consider the appropriate level of deference owed to the plan administrator's decision on how to treat the SSDI offset under the Plans. Renfro contends that we should not afford any deference to Unum's decision because Unum operates under a structural conflict of interest.

**[1]** The standard for judicial review of benefit determinations by plan administrators of plans covered under the Employment Retirement Income Security Act of 1974 (ERISA) was prescribed by the Supreme Court in *Firestone Tire & Rubber Company v. Bruch*, 489 U.S. 101 (1989). The court set out the following principles: (1) we should be guided by the principles of trust law; (2) we should review decisions regarding plan benefits *de novo* unless the plan provides to the contrary; (3) the plan provides to the contrary if it grants the administrator "discretionary authority" to determine eligibility for benefits—requiring a more "deferential standard of review;" and (4) if the plan gives discretion, but the administrator operates under a conflict of interest, then "the conflict of interest must be weighed as a factor in determining whether there is an abuse of discretion." *Met. Life Ins. Co. v. Glenn*, 554 U.S. 105, 110-11 (2008) (citing *Firestone*, 489 U.S. at 111-15) (internal quotation marks omitted) (hereinafter *MetLife*).

**[2]** Thus, the standard of review of Unum's decisions turns mainly on whether discretionary authority is granted. If such discretionary authority is granted, then review is for abuse of discretion, and we may only overturn the decision if the administrator relied on "clearly erroneous findings of fact" in making the benefit determination. *Taft v. Equitable Life Assurance Soc.*, 9 F.3d 1469, 1473 (9th Cir. 1993).

**[3]** It is undisputed that both plans grant Unum discretionary authority:

### DISCRETIONARY ACTS

In exercising its discretionary powers under the Plan, the Plan Administrator, and any designee (which shall include Unum as a claims fiduciary/will have the broadest discretion permissible under ERISA and any other applicable laws and its decisions will constitute final review of your claim by the Plan. *Benefits under this Plan will be paid only if the Plan Administrator or its designee (including Unum), decides in its discretion that the applicant is entitled to them.*

**[4]** However, exactly how much discretion is afforded under the abuse of discretion standard for ERISA claims varies if a plan administrator faces a "structural conflict of interest: since it is also the insurer, benefits are paid out of the administrator's own pocket, so by denying benefits, the administrator retains money for itself." *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009). When a conflict exists, review is still performed under an abuse of discretion standard, but the analysis is more complex. *Id.* at 631 ("These cases should not be mistaken to imply that the existence of a conflict of interest alters the standard of review itself, rather than merely its application."); *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006) (en banc) ("[T]he existence of a conflict of interest is

relevant to how a court conducts abuse of discretion review.").

**[5]** "[T]he court must consider numerous case-specific factors, including the administrator's conflict of interest, and reach a decision as to whether discretion has been abused by weighing and balancing those factors together." *Montour*, 588 F.3d at 630. The weight assigned to the conflict of interest factor depends on the circumstances of each case, as explained by the Supreme Court in *MetLife*:

> The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

554 U.S. at 117 (internal citations omitted). Thus, we are to treat the existence of a conflict of interest as "a factor to be weighed, adjusting the weight given that factor based on the degree to which the conflict appears improperly to have influenced a plan administrator's decision." *Montour*, 588 F.3d at 631.

**[6]** Renfro argues that we should afford little or no deference to Unum's decision because of Unum's strong conflict of interest, evidenced by its "self-dealing" reflected in its early admissions that a double offset would not be appropriate and in its decision that results in a windfall to Unum. We

reject Renfro's contention, and find that, on the whole, the record does not support Renfro's view that Unum acted in a way reflecting bias against Renfro, or which constituted self-dealing.

**[7]** Renfro asserts that Unum inconsistently handled the payments required under his Plans, and that this is a factor showing that Unum's conflict of interest influenced its decision on the offset issue. In support, Renfro cites *Lang v. Long-Term Disability Plan*, 125 F.3d 794 (9th Cir. 1997), in which we held that a plan administrator's decision was not entitled to any deference due to a strong conflict. As evidence of that conflict, we found it telling that the administrator first denied the plaintiff's claim because she failed to show that her disability was caused by or contributed to by a physical ailment. *Id.* at 799. On review, the plaintiff presented clear evidence from her treating physician that she suffered from a physical ailment, but the plan administrator then took the position that the plaintiff had to make a further showing that her physical ailment was "disabling." *Id.* We held that the inconsistent reasons given by the administrator were evidence of self-interest. *Id.*

**[8]** In contrast, we find no such inconsistent reasoning here. First, Renfro argues that Unum acted inconsistently when it used the retroactive benefit owed to Renfro from the SMP to repay itself for money owed to it from overpayment on the FDP—effectively treating the plans as commingled—but then treated the two Plans as wholly separate, by applying the offset to both Plans. Renfro's contention is not supported by the record. Rather, the record shows that Unum always treated the Plans individually, and that the decision to pay itself for the overpayment on the FDP from the retroactive benefits it owed to Renfro from the SMP was permitted both by the plain language of the Plans, and an agreement with Renfro's attorney.

The Plans state that:

## WHAT HAPPENS IF UNUM OVERPAYS YOUR CLAIM?

> Unum has the right to recover any overpayments due to:
> - fraud;
> - any error Unum makes In processing a claim; and
> - *your receipt of deductible sources of income.*
>
> *You must reimburse us in full. We will determine the method by which the repayment is to be made.*
>
> Unum will not recover more money than the amount we paid you.

The overpayment arose from the award of SSDI benefits that Renfro received, which included a retroactive payment reaching back to November 2005. In its letter approving Renfro's benefits, the SSA stated that Renfro would "receive $25,177.00 around January 19, 2007" for the retroactive payment. In a letter dated February 26, 2007, Unum informed Renfro of the amount of the overpayment on the FDP he was obligated to repay. Though Renfro should have received the SSDI retroactive payment by January 19, 2007, Renfro did not respond to Unum's February 26, 2007 letter, or pay the amount owed to Unum. Accordingly, in another letter dated March 14, 2007, Unum informed Renfro that it would offset the full monthly benefit otherwise payable to him under the FDP until Unum's overpayment was repaid in full. X9* X8 This is allowed under the FDP, which authorizes Unum to "determine the method by which the repayment is made."

   **[9]** Meanwhile, Unum also was reviewing its denial of Renfro's claim under the SMP. After Renfro submitted a doctor's report to Unum, Unum reversed its original decision

rejecting coverage, and found that Renfro was eligible for coverage. Unum approved Renfro for prospective benefits, as well as a year of retroactive benefits. Next, the record reflects a phone call between Renfro's attorney and Unum, wherein Renfro's attorney asked about retroactive back pay. The record of the phone call states that on July 19, 2007:

> He [Renfro's attorney] asked about back pay and I advised based on our current considerations the back pay would be $51K. He asked if this was with offset, advised as the full offset is currently on the other file if all remains the way we are currently anticipating this would be the full back benefit with no further reduction for SSDI. *Advised there is an overpayment on the other claim of $19297.78 that would need to be settled before payment and this would reduce payment to [sic] 31702.22. He asked if the paperwork could note the $51K from this claim with the payment being sent to him and a check for the [sic] 31702.22.* Advised that he could drop us a note and that should not be a problem. He states he just wanted to know because the insured would have owed this on the other claim regardless of the outcome on this one.

Subsequently, Renfro's attorney sent a letter to Unum on July 20, 2007, requesting payment of the retroactive [back] pay and summarizing the discussion regarding offsetting the overpayment from the Funky Door claim from the retroactive back pay on the ServiceMaster claim. Thus, Unum's offsetting of funds owed to it by Renfro on FDP overpayments against retroactive payments due to Renfro under the SMP was both authorized by the express language of the Plans, and by agreement between Renfro's attorney and Unum.

[10] Second, Renfro also argues that Unum took inconsistent actions with regards to the handling of the offset on the ServiceMaster account. Renfro is mistaken. The record

reflects that Unum did not make any final decision about how to handle the offset on this account until it sent a letter to Renfro dated April 29, 2009. When the ServiceMaster coverage was approved on July 6, 2007, Unum noted in its records that it was aware that Renfro was receiving SSDI and that the SSDI was being offset in the Funky Door account already. Unum further reflected in its notes for a follow-up phone call with Renfro's attorney on July 19, 2007 that he was informed again that Unum had not yet decided how to handle the issue. Specifically, the note stated: "advised that payment should be complete within the next 3-5 business days *as we were still reviewing the fact that insured with two claims that have the right to offset for SSDI*" and "advised that so far we are considering how the offset total to be available to the claims, not a full amount offset on each but *also advised that this as under review and could involve ER agreement*."Again, on August 2, 2007, Unum stated that it was still reviewing the SSDI offset issue: "As the prior claim has been charged with back benefits for Mr. Renfro's receipt of Social Security Disability, we have not adjusted the benefit on this claim for the period of payment above. *We are continuing to evaluate both claims for consideration of offsets going forward*."

**[11]** Renfro is correct that some evidence in the record shows that Unum was seriously considering whether the offset should be applied to both accounts. However, nothing indicates that there was an inconsistency because Unum's statements and actions showed that they were tentative and that Unum had not made any final decision yet. For example, while Unum stated "it is recommended we not further reduce this claim by the same SSDI benefit being reduced on [the FDP]. It would be reasonable to offset half of the award on each claim," Unum stated immediately thereafter "*but that consideration should be left to the team reviewing both claims ongoing*." Thus, this was not a final decision by Unum regarding how the offsets would eventually be handled. Unum also stated that "a decision was made to not pursue a retro over-payment from both claims as the insured only received one SS

retro and it would have been unreasonable to pursue an over-payment on both claims." Renfro argues that this statement shows that Unum felt that applying the offset to both claims was unreasonable. However, this statement only applies to the *retroactive* overpayment, and does not indicate what Unum would do *prospectively* concerning the claim. Moreover, Unum continued to emphasize that "[w]e would continue to evaluate both claims for consideration of offsets moving forward. *A determination was never made with respect to an ongoing SSDI offset in both claims*."

[12] As the district court correctly found, the two inconsistencies alleged by Renfro involve situations that are very different from the one encountered in *Lang*. In *Lang*, an insurance company gave inconsistent reasons for rejecting the plaintiff's claim. 125 F.3d at 799. In contrast, there was no such inconsistency here. Unum was consistent in treating the FDP and the SMP separately, and only used funds from one to offset a debt on the other after reaching an agreement with Renfro, through his attorney. Moreover, Unum was consistent in its handling of the offset because it had not made any final decision, and did not provide a definitive answer to Renfro until its letter of August 2009. The fact that Unum paid Renfro the full amount on the SMP—without offset—from 2007 through 2009 does not show any inconsistency concerning the handling of the claim, since Unum explicitly stated that the issue was still under consideration.[1]

[13] Looking at other factors beyond the alleged inconsistencies, the record does not support that Unum has a history of "biased claim administration" in its dealings with Renfro. *MetLife*, 554 U.S. at 117. Though it initially rejected Renfro's

---

[1]This is not to say that a plan may always characterize any favorable decision on behalf of an insured as "tentative," so that it may retain the option of changing its mind later. In this case, the language of the plans and Unum's good faith dealing with Renfro upon discovering the error, also lead us to the conclusion that Unum did not abuse its discretion.

ServiceMaster claim, after being presented with new medical evidence, Unum reversed itself, and calculated the retroactive and prospective payments it owed or would owe to Renfro. It did not conjure a new excuse to reject Renfro's claim. Furthermore, Unum was aware of the offset issue from the outset, when it approved the ServiceMaster claim. It never indicated to Renfro that it had made a final decision concerning how to handle the issue until April 29, 2009, and it consistently told him and his attorney that the issue was still "under consideration." While it considered the issue, Unum tentatively paid Renfro the full amount—without offset. Finally, when it decided that it was within the plain language of both Plans to take the offset from each plan, Unum admitted that a "clerical error was made by not making a timely determination that after sending the August 2, 2007 letter" and decided not to pursue any overpayment of the ServiceMaster payments that did not account for this offset. These actions were adverse to Unum's own interests, and are significant indicators that Unum was not biased against Renfro in its dealings with him.

**[14]** Beyond the structural conflict that may exist because Unum determines coverage and pays out on the plans, Unum's behavior reflects that it was careful in its consideration of the Plans, and erred on the side of caution as it determined what to do with the offset issue. The fact that Unum's ultimate decision was contrary to Renfro's interests does not necessarily show that Unum was biased during the decision-making process, or that it reached an incorrect decision. Rather, this goes more to the actual merits of the case, which we address *infra*. Accordingly, we conclude that Unum's conflict of interest in this case did not cause it to be biased in its plan administration, and we assign the conflict of interest little weight in our abuse of discretion analysis.

## II.  Unum's Decision Concerning the SSDI Offsets

**[15]** We next turn to the merits of Renfro's claim. Unum ultimately decided that it was permitted, based on the plain

language of the Plans, to deduct Renfro's SSDI payment separately from each plan. We conclude that Unum did not abuse its discretion in reaching this decision.

**[16]** The plain language of the Plans permits Unum to deduct the offset from both Plans. The FDP and the SMP call for the payment of different monthly benefits to Renfro, but both state that the "payment may be reduced by *deductible sources of income* and disability earnings." In turn, the Plans define "deductible sources of income" to include "[t]he amount that you, your spouse and your children receive or are entitled to receive as disability payments because of your disability under . . . the United States Social Security Act." Therefore, Renfro's SSDI benefit of $1730 is deductible under the plain language of either plan. Neither of the Plans contains any language that make an exception for this deduction in a case where an employee is covered under two separate plans. The plain language of the Plans expressly mandates the actions that Unum took.

We are unpersuaded by Renfro's arguments to the contrary. First, Renfo argues that the double offset is not allowed because Unum can only deduct the amount that Renfro "recieve[s] or [is] entitled to receive" and that Renfro only receives $1730. No one disputes that Renfro receives only $1730. Unum is deducting exactly what Renfro receives— $1730—but doing so under *each* plan. As discussed *supra*, this action is not barred by the plain language of the Plans. Renfro's position would require us to interpret the amount that he "receives" to be $0 during the calculation of benefits for the second plan, once the deduction has been taken from the first plan. This interpretation distorts the meaning of the word "receives." There is nothing in either plan indicating that the amount one "receives" should vary depending on whether that amount has already been taken as an offset under another plan.

Second, Renfro also argues that the term "receives or entitled to receive" in each policy must be ambiguous because it

yielded "differing interpretations of plaintiff and Unum." The term "receives" is not ambiguous in this context—Renfro receives $1730 in SSDI benefits monthly. The differing positions that Unum and Renfro take arises from the interaction between the two Plans, not from the plain meaning of the term in isolation.

**[17]** Moreover, the Plans explicitly list what sources of income are not deductible, and that list does not cover the situation in dispute here. For example, the Plans list 401(k) retirement plans, individual retirement accounts, profit sharing plans, and several others as sources of income that are not to be deducted. The Plans also contemplate other situations in which a beneficiary may have two plans. For example, they list "individual disability plans" as a source of non-deductible income. In other words, the amount that Renfro receives as a monthly benefit from the FDP will not be deducted from the monthly benefit he receives from the SMP. Had the Plans intended to make an SSDI offset non-deductible once it has been deducted from one plan, the Plans could easily have been drafted to include as sources of non-deductible income "SSDI income that has already been offset under another individual disability plan," or words to that effect.

Our reasoning mirrors that of *Isner v. Minnesota Life Insurance Company*, 677 F. Supp. 2d 950 (E.D. Mich. 2009). In that case, the court held that ERISA permitted a "double offset" by two separate disability plans of a single SSDI payment. The plans in *Isner* were not administered by the same insurance company—as they are in this case—but one of the companies involved was Unum, and the language from both plans was substantially similar to the plan language in this case. *See id.* at 952-54. The district court concluded that terms of the plans were not ambiguous and that it must give effect to the plain language of the plans:

> Before a Court can ignore the plain language of a policy, however, there must be an ambiguity necessi-

tating a choice between reasonable interpretations of the policy language. Whether the language is ambiguous is a question of law. In this case, I have no trouble concluding that the language of the plan itself as known by the employees, or as the employees should have known is unambiguous. The plans expressly authorize integration of all Social Security benefits, without regard for whether any other plan integrates the same benefits. As the Sixth Circuit explained in *McBarron*, each plan "has the absolute right to enforce its contract" with Plaintiff, even if the result is harsh. Any alternative urged by Plaintiff could endanger the stability of the plans by forcing them to provide benefits not contemplated by the plans.

*Id.* at 957-58 (internal citations and quotation marks omitted). While noting that the result may be "harsh," the court stated that it did not have "the power to redraft insurance contracts in order to palliate the effects of considered language on the occasional hard case" and therefore, had to give effect to those provisions. *Id.* at 957 (internal citation and quotation marks omitted). We find the reasoning in *Isner* persuasive, and reject Renfro's attempt to distinguish *Isner*. The fact that Unum is the common plan administrator in this case does not detract from the fact that Renfro was covered under two different plans, just as the insured was in *Isner*, regardless of who administered them. It is a random occurrence that Unum happens to administer both of Renfro's plans. Unum is not treating Renfro *differently* because he has two plans with Unum. Rather, it is attempting to treat Renfro the same way under each plan, based on the plain language of each plan, just as another beneficiary would be treated under either plan.

Ultimately, even though we acknowledge, as the court did in *Isner,* that the result may seem "harsh," we cannot ignore the plain language of the Plans in order to "palliate the effects of considered language on the occasional hard case." *Isner*, 677 F. Supp. 2d at 957. Unum is not receiving a "windfall"

here. Rather, it is receiving what an unbiased underwriter would say it should receive under each plan. The result should not be different simply because it happens to insure the same beneficiary under both Plans.

**[18]** In light of the level of discretion afforded to Unum under the Plans, and the plain meaning of the Plans' language, we disagree with Renfro that the result would be contrary to ERISA's purpose or contravene the purpose of the offset provision. Accordingly, we find that Unum's decision to apply the SSDI offset under each of the Plans was not an abuse of discretion.

## III.   Equitable Estoppel

**[19]**  Renfro's final argument is that equitable estoppel bars Unum from taking the offset under both Plans. A beneficiary may recover benefits under ERISA based on an equitable estoppel theory, if he shows: (1) a material misrepresentation; (2) reasonable and detrimental reliance on the representation; (3) extraordinary circumstances; (4) the provisions of the plan at issue are ambiguous, such that reasonable persons could disagree as to their meaning or effect; and (5) the representations must have been made to the beneficiary involving an oral interpretation of the plan. *Pisciotta v. Teledyne Indus., Inc.*, 91 F.3d 1326, 1331 (9th Cir. 1996). Moreover, a beneficiary cannot obtain recovery on the basis of estoppel "in the face of contrary, written plan provisions." *Davidian v. S. California Meat Cutters Union and Food Employees Ben. Fund*, 859 F.2d 134, 134 (9th Cir. 1988).

**[20]** We conclude that equitable estoppel does not help Renfro because he fails to satisfy several of the required evidentiary showings. As previously discussed, the Plans' language is not ambiguous. Moreover, no material misrepresentation was made to Renfro because Unum consistently represented that the issue under the SMP was still under review. Since Renfro had not received a final decision on the

issue from Unum when Renfro says he relied on Unum's statements, Renfro's reliance, if any, was unreasonable. Finally, Renfro fails to establish that there were any "extraordinary circumstances" here that warrant the application of equitable estoppel.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment in favor of the Plans.