**Margaret KREEGER, Plaintiff,**

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA; BP WELFARE Plan Trust–III's Insurance Plan, Defendants.**

**Case No. CV 09–08262 GAF (OPx).**

United States District Court, C.D. California.

Feb. 28, 2011.

Corinne Chandler, Niamh E. Doherty, Kantor & Kantor LLP, Northridge, CA, for Plaintiff.

Adrienne C. Publicover, Sheena Veena Jain, Wilson Elser Moskowitz Edelman &

Dicker LLP, San Francisco, CA, for Defendants.

### MEMORANDUM & ORDER REGARDING BENCH TRIAL

GARY ALLEN FEESS, District Judge.

### I. INTRODUCTION

Plaintiff Margaret Kreeger ("Plaintiff" or "Kreeger"), a 57–year–old woman who formerly held a high level position as in-house counsel at BP Corporation North America, Inc. ("BP"), suffers from multiple sclerosis ("MS"). The condition was first diagnosed in 1988, but Kreeger managed to continue working without accommodation for ten years. In 1998, due to the progress of the disease, Kreeger's work schedule was modified to permit her to work three days at the office and to telecommute two days each week. However, in December 2005, due to further deterioration in her condition, including distress due to memory dysfunction, chronic depression, anxiety and pathological fatigue, Plaintiff was no longer able to work.

In May 2006, Plaintiff applied for long term disability benefits pursuant to her employee benefits plan and began receiving her requested benefits a month later. Defendant Life Insurance Company of North America ("LINA"), which funded and administered the disability benefits plan, approved the application. However, on May 8, 2008, LINA notified Plaintiff that it was terminating her benefits effective April 30, 2008. While Plaintiff sought to reverse this decision on appeal, LINA affirmed its denial of benefits on October 29, 2008. Plaintiff commenced this action on November 12, 2009, alleging a cause of action under the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff contends that Defendants LINA and BP Welfare Plan Trust–III's Insur-

ance Plan (collectively, "Defendants") wrongfully terminated her benefit payments and seeks reinstatement of those benefits, payment of back benefits, and interest to the date of Judgment. (Docket No. 62, Plaintiff's Opening Trial Brief at 25.)

The matter came on for trial on the administrative record on January 11, 2011. Having considered the evidence in the administrative record, the briefing of the parties, and the arguments presented at the trial, the Court finds for Plaintiff for the reasons discussed below.

## II. BACKGROUND

### A. PLAINTIFF'S CLAIM

Plaintiff Margaret Kreeger ("Plaintiff") was a former Senior Managing Attorney at BP for twenty years. (Administrative Record ("A.R.") at 254, 903.) As part of her job, Plaintiff worked under stressful conditions, managing other attorneys, training thousands of employees, and coordinating multi-million dollar class action lawsuits. (*Id.* at 254.) Despite being diagnosed with Multiple Sclerosis ("MS") in 1988, Plaintiff continued to work full time for BP without any accommodations until 1998, when she requested to work from home two days a week. (*Id.* at 855.)

By November 2005, after her condition worsened, Plaintiff consulted with her regular neurologist, Dr. Helfgott. (*Id.* at 853–856.) After evaluating Plaintiff, Dr. Helfgott noted that Plaintiff was suffering from "signs of cognitive decline," has "pathologic fatigue," and "cognitive impairment." (*Id.* at 856.) Moreover, an MRI was performed and the results showed that there had been white matter changes consistent with advanced MS. (*Id.* at 854.)

On December 13, 2005, Plaintiff visited Dr. Helfgott for a subsequent check up. (*Id.* at 850.) After this visit, Dr. Helfgott remarked in his report that Plaintiff was very distressed and tearful during the vis-

it, and concluded that Plaintiff had dysfunction of memory, pathologic fatigue, and chronic depression with stress and anxiety. He recommended that Plaintiff be placed on three months of disability. (*Id.*) Subsequently, Plaintiff submitted a claim for long term disability to LINA, the insurer for her employer's disability plan. On April 19, 2006, LINA received Plaintiff's claim and hired a third party vendor to represent Plaintiff in connection with her Social Security Application, which was subsequently granted in December 2006. (*Id.* at 771, 783.)

In May of 2006, Dr. Helfgott mailed medical records pertaining to Plaintiff's five visits from November to April of 2006 to LINA. (*Id.* at 747, 836, 840, 850, 855.) In sum, Dr. Helfgott's records indicated that Plaintiff suffered from fatigue, depression, suffered emotional lability, and that she was prescribed, among other medications, Provigil for her pathological fatigue. (*Id.*) In one of his reports, Dr. Helfgott characterized Kreeger as suffering from Involuntary Emotional Expression Disorder ("IEED"). (*Id.* at 743.)

In March of 2007, LINA again asked Dr. Helfgott to provide medical records and to complete an Attending Physician Statement ("APS"). (*Id.* at 737.) Dr. Helfgott completed the APS on March 14, 2007 and noted that "pathological fatigue" and "cognitive decline" impacted Plaintiff's ability to work and stated that the nature of Plaintiff's impairments precluded her from returning to work as an attorney. (*Id.*) Dr. Helfgott also listed Provigil, Aricept, and Namendi as medications that he had prescribed for her conditions. (*Id.*)

In January of 2008, LINA notified Plaintiff that it was commencing its "any occupation" investigation. (*Id.* at 720.) Around this same time, LINA also requested updated reports from Dr. Helfgott and asked that he complete a Medical Re-

quest Form and a Physical Abilities Assessment. (*Id.* at 698, 700.) For the Medical Request Form, Dr. Helfgott once again noted that "cognitive decline," and "pathologic fatigue," prevented Plaintiff from returning to work. (*Id.* at 698.) With regard to the Physical Abilities Assessment, the form only asked if Plaintiff could push, pull, climb, see, hear, etc ..., and Dr. Helfgott noted that these factors were not applicable to Plaintiff's diagnosis. (*Id.* at 700.)

LINA also requested that Plaintiff complete a "Disability Questionnaire," which requested information regarding her daily activities. (*Id.* at 693, 718–19.) Plaintiff reported on the form that she does yoga three days a week for fifteen minutes as part of her regular exercise program. (*Id.* at 693.) Plaintiff also noted that she was taking MCLE courses, could not return to work because of fatigue and cognitive issues, and that she was taking twenty-eight types of medications and vitamins. (*Id.* at 693–96.)

In February of 2008, LINA began to investigate Plaintiff for potential fraud because she had reported on the Disability Questionnaire that she performed yoga at home and purportedly conducted "business." (*Id.* at 686.) The claim was subsequently referred to LINA's Special Investigations Unit ("SIU") and filed with the California Department of Insurance as a suspected fraud case. (*Id.*); (Part B of A.R. at 3.) From March 5 to March 9, 2008, the SIU conducted a Field Investigation of Plaintiff and drafted a report with regard to this matter. (Part B of A.R. at 9.) Pursuant to the report, the SIU explained that (1) Plaintiff's husband operated a business from their residence, but that Plaintiff had no active role in it; (2) Plaintiff was not very active and left her home infrequently; and (3) Plaintiff's husband performs all of the daily errands for the household. (*Id.* at 9–10.) Moreover,

the SIU also reported that Plaintiff had driven to a bookstore on one occasion, some department stores, and a massage spa. (*Id.* at 10.) Based on these findings, no further investigation was ordered. (*Id.*)

In April of 2008, LINA submitted Plaintiff's claim to MCMC, a peer review vendor, for a neurological paper review. (A.R. at 640.) Dr. Sands conducted a one hour review of Plaintiff's claim and concluded that Plaintiff could return back to work because she can lift fifty pounds occasionally, twenty-five pounds frequently, stand or walk for up to six hours per day, bend, stoop, and squat, and use her upper extremities. (*Id.* at 638–642.) On May 8, 2008, LINA notified Plaintiff that it was terminating her benefits effective April 30, 2008. (*Id.* at 131.) Specifically, the termination letter noted that "the independent medical examination, surveillance videos and medical records on file were inconsistent and do not support that [Plaintiff is] unable to perform [her] occupation with BP Corporation." (*Id.* at 132.) Plaintiff was advised that if she wished to appeal the decision, the written appeal was required to be submitted within 180 days of receipt of the termination letter. (*Id.*)

## B. PLAINTIFF'S APPEAL AND SUBSEQUENT ACTION

On May 24, 2008, Plaintiff notified LINA that she wanted to appeal its decision to terminate her disability benefits. (*Id.* at 646.) In her notice of appeal, Plaintiff notified LINA that, if there was something specific that they wanted with regard to her claim, she would provide it. (*Id.*) Subsequently, on July 11, 2008, Plaintiff submitted her appeal letter to LINA. (*Id.* at 253.) Plaintiff explained in her letter that she had a psychological and cognitive test conducted by Dr. McCleary, a specialist at the University of Southern California, that

would confirm her continuing disability and inability to return back to work. (*Id.* at 253.) The results of Dr. McCleary's tests were faxed to LINA. (*Id.*) Dr. McCleary's report explained that Plaintiff had been administered several tests from which the doctor determined that Plaintiff is "suffering from a high level of emotional distress due to obsessive compulsive tendencies and depression." (*Id.* at 241.) Dr. McCleary also noted that when he discussed with Plaintiff the source of her emotional distress, she became distraught and started to cry for an hour. (*Id.*) In sum, Dr. McCleary concluded as follows:

It is highly recommended that [Plaintiff] remain on disability until her emotional status improves. Given her current level of emotional distress she would be unable to function at work. In addition, the stress and cognitive demands of a work environment can be expected to exacerbate her already unacceptably severe feelings of anxiety and depression.

(*Id.* at 232.)

On August 20, 2008, LINA requested that Dr. Mendez conduct a paper review of Plaintiff's file. (*Id.* at 220–22.) Dr. Mendez initially contacted Dr. Helfgott and learned from him that Plaintiff becomes emotionally labile when she is stressed at work and makes frequent mistakes, and that her fatigue has been an issue for a number of years. (*Id.* at 222.) Based on this conversation and after reviewing Plaintiff's file, Dr. Mendez ultimately concluded that "restrictions from regular work duties are not medically supported on the basis of cognitive and/or physical limitations." (*Id.*) Subsequently on August 22, 2008, LINA notified Plaintiff that it has been unable to make a decision on her appeal. (*Id.* at 121.)

In October of 2008, LINA requested a neuropsychological peer review be conducted by Dr. DeFilippis. (*Id.* at 198.) Pursuant to Dr. DeFilippis's report, he evaluated, among other documents, the evaluations by Dr. McCleary and Dr. Helfgott. (*Id.* at 201.) In sum, Dr. DeFilippis concluded that there was no medical evidence substantiating the presence of cognitive impairment. (*Id.* at 204–207.) On October 29, 2008, LINA informed Plaintiff that it was affirming its previous denial of benefits. (*Id.* at 193.) On February 25, 2009, Plaintiff notified LINA that she was appealing the decision. (*Id.* at 190.) In her letter, Plaintiff once again reiterated the nature of her condition and explained why she could not return back to work. (*Id.* at 190–192.) Plaintiff, who was undeniably suffering from a most serious medical condition whose symptoms had worsened over the years, wrote:

I am at a loss as to what additional information would be beneficial to you in this appeal. I have added a psychiatrist to my treating doctors and can provide a report from him but I fear it would be a waste of his time. I have repeatedly asked what it is you need to know and you have responded that I can submit whatever I like. This is not helpful. I have had several independent doctors tell you that in their professional opinions I am no longer able to work as a result of a covered disability, also *I have offered to be examined by your doctors and you have refused that. What is it that you want?*

(*Id.* at 191) (emphasis added).

On March 19, 2009, LINA acknowledged receipt of Plaintiff's letter and advised her that it cannot consider her appeal unless she submits new medical information. (*Id.* at 115.) On April 16, 2009, Plaintiff notified LINA that she would be submitting new information from Dr. Helfgott and reports from two new doctors. (*Id.* at 188.) Finally, on November 12, 2009, Plaintiff commenced this present action

and a bench trial was held on January 11, 2011. (Docket Nos. 1, 83.)

### C. PLAINTIFF'S POLICY

Plaintiff's employer sponsored plan defines disability as follows:

You are considered Disabled if, solely because of Injury or Sickness, you are either:

1. unable to perform all the material duties of your job at BP or a Qualified Alternative; or

2. unable to earn 80% or more of your Indexed Covered Earnings.... After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is either:

1. unable to perform all the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; or

2. unable to earn 80% or more of his or her Indexed Covered Earnings.

(*Id.* at 423.)

## III. DISCUSSION

### A. ERISA Standard of Review

■ The policy states that LINA funds the ERISA-subject long term disability policy under which Plaintiff made her claim. (A.R. at 426.) Additionally, the Policy Documents unambiguously provide that LINA "shall have the authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact." (*Id.* at 427.) The abuse of discretion standard is therefore to be applied in this case. However, as the discussion below explains, the determination of how to apply that standard is more complex than may first appear.

### 1. FIRESTONE

■ In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court addressed the appropriate standard of judicial review of benefit determinations made by administrators or plan fiduciaries under 29 U.S.C. § 1132(a)(1)(B). 489 U.S. at 111–13, 109 S.Ct. 948. ERISA plan administrators are to be analogized to trustees in a common-law trust; benefit determinations are fiduciary acts, for which plan administrators owe beneficiaries a special duty of loyalty. *Id.* at 109, 109 S.Ct. 948. Consistent with these trust law principles, courts are to review benefits denials "under a *de novo* standard" unless the ERISA plan provides to the contrary. *Id.* at 115, 109 S.Ct. 948. Where a plan grants an "administrator or fiduciary discretionary authority" to determine benefits eligibility, courts owe the administrator greater deference, and a denial is reviewed for an abuse of discretion. *Id.* at 111, 109 S.Ct. 948 (citing abuse of discretion standard in RESTATEMENT (SECOND) OF TRUSTS § 201 (1957); *see also Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866 (9th Cir.2008). Generally, when a court reviews an administrator's decision under the traditional abuse of discretion standard, it must uphold the decision unless it is not grounded on "*any* reasonable basis." *Sznewajs v. U.S. Bancorp Amended & Restated Supp. Benefits Plan*, 572 F.3d 727, 734–35 (9th Cir.2009) (internal quotation marks omitted).

■ The abuse of discretion standard, however, is applied in a different way where the plan administrator suffers from a structural conflict of interest—notably in those cases where the administrator is also the funding source for the benefit payment.

### 2. METROPOLITAN LIFE

In *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) (*"MetLife"*), the Supreme Court explained that a structural conflict of interest exists where, as is often the case, the same entity funds an ERISA benefits plan and makes claims determinations. 128 S.Ct. at 2346, 2348. When such a conflict exists, a reviewing court is to apply the abuse-of-discretion standard in a complex fashion. 128 S.Ct. at 2346–48. Simply "construing the terms of the underlying plan and scanning the record for medical evidence supporting the plan administrator's decision is not enough, because a reviewing court must take into account the administrator's conflict of interest as a factor in the analysis." *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 629–30 (9th Cir.2009) (citing *MetLife*, 128 S.Ct. at 2346, 2348, 2350).

The importance of the conflict-of-interest factor to the abuse-of-discretion standard varies from case to case. The conflict of interest:

> should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.... It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*MetLife*, 128 S.Ct. at 2351.

### 3. NINTH CIRCUIT GUIDANCE

■ Recently, in *Montour* the Ninth Circuit has provided additional guidance for applying the abuse-of-discretion standard in conflict-of-interest scenarios. 588 F.3d 623, 629–30. That case reiterates that a determination of whether a plan administrator abused its discretion turns on a consideration of "numerous case-specific factors." *Id.* at 630. Citing to *MetLife*, the court noted that the reviewing court must consider, as one of those factors, the existence of a conflict of interest and should assign weight to the conflict of interest based on the apparent degree to which the conflict improperly influenced the administrator's decision. *Id.* Other factors that "frequently arise" in ERISA cases include: (1) the quality and quantity of medical evidence; (2) whether the plan administrator subjected the claimant to an in-person medical evaluation or merely relied on a paper review of the claimant's existing medical records; (3) whether the administrator provided its independent experts with all of the relevant evidence; and (4) as applicable, whether the administrator considered a contrary Social Security Administration ("SSA") disability determination. *Id.* at 630. Courts are directed to "reach a decision as to whether discretion has been abused by weighing and balancing [the] factors." *Id.*

### 4. APPLICATION

Because the policy explicitly provides discretionary authority in determining benefits eligibility to an administrator, the administrator's findings should be reviewed under an abuse of discretion standard. *Firestone*, 489 U.S. at 111, 109 S.Ct. 948. Additionally, because LINA both funds the policy and has authority to deny benefits determinations, a structural conflict of interest, like that discussed in *MetLife* exists. 123 S.Ct. at 2346–48. The more complex, multi-factor application of the abuse-of-discretion standard of review is therefore necessary.

### a. Quality and Quantity of Medical Evidence

As an initial matter, the Court notes that there is no question that Kreeger suffers from multiple sclerosis, a serious, debilitating and disabling progressive disease of the nerves and brain. The evidence plainly establishes, through both objective and subjective data, that Kreeger has suffered from the disease for more than 20 years and that she has become increasingly symptomatic with the passage of time. Moreover, the disease has caused related emotional and psychological conditions that further create substantial impediments to her ability to function as an attorney or in any other capacity that requires high-level cognitive functioning. Tests conducted by Dr. McCleary further indicate that any attempt to return to work would exacerbate her emotional distress. There is no evidence of any sort to suggest that Kreeger's physicians are unqualified to render their diagnoses or that their opinions evidence any sort of bias or improper motive. In short, any suggestion that Kreeger is malingering would be an indication that this claim is being denied in bad faith.

Indeed, the record reflects that Kreeger has offered to provide any information that LINA needed for its evaluation and further offered to submit to an examination by LINA's doctors. That offer was refused. Instead, LINA submitted the medical records to three physicians—Dr. Sands, Dr. Mendez, and Dr. DeFilippis—for a paper review. The record reveals that these reviews were at best superficial and appeared either to misunderstand or to ignore relevant information in Kreeger's medical records. First, with regard to Dr. Sands's peer review, it appears that he spent a total of one hour reviewing Plaintiff's file, and despite having Dr. Helfgott's reports and notes regarding Plaintiff's diagnosis of multiple sclerosis and the symptoms of chronic depression, stress and anxiety, emotional lability, pathological fatigue, and cognitive impairment, he concluded that Plaintiff could work full time simply because the surveillance videos indicated that she could run simple errands and was capable of lifting fifty pounds occasionally, twenty-five pounds frequently, and stand or walk for six hours per day. (A.R. at 638–642.) It is apparent from this review that Dr. Sands failed to fully appreciate that standing, lifting and walking were unrelated and irrelevant to her work and that cognitive deficits, emotional lability and anxiety attacks prevented her from performing the duties of any job demanding high level cognitive functioning.

Next, it is evident from Dr. Mendez's peer review that LINA failed to provide him with many of Plaintiff's pre–2008 medical records. The Administrative Record establishes that Dr. Helfgott mailed to LINA medical records pertaining to five critical visits from November to April of 2006. (A.R. at 747, 836, 840, 850, 855.) And yet, it appears that the only materials from Dr. Helfgott that Dr. Mendez may have reviewed were generated in 2007. (*Id.* at 220.) Moreover, Dr. Mendez was informed from both his conversation with Dr. Helfgott and his review of Dr. McCleary's report that Plaintiff was unable to return to work because of high level emotional lability, obsessive-compulsive tendencies, and depression. (*Id.* at 221–22.) Dr. Mendez was well aware of Dr. Helfgott's conclusion that cognitive tests did not "replicate the cognitive demands of her work requirements" and he tacitly acknowledged that her psychological response to her deterioration as a result of the multiple sclerosis was something he could not assess. (*Id.*) Nevertheless, Dr. Mendez concluded that "restrictions from regular work duties are not medically supported on the basis of

cognitive and/or physical limitations." (*Id.* at 222.) Dr. Mendez relied principally on Dr. McCleary's conclusion that Kreeger's testing failed to highlight "any impaired cognitive domains." (*Id.*) In short, while conceding that he could not assess Plaintiff's psychological condition, Dr. Mendez focused solely on that portion of Dr. McCleary's examination—the cognitive testing—that supported his conclusion that the disability benefit should be denied.

Finally, Dr. DeFilippis's review also failed to seriously consider the effects of Plaintiff's IEED and other emotional conditions that prevented her from continuing to work as an attorney. Specifically, Dr. DeFilippis discounted the medical reports of Dr. Helfgott and Dr. McCleary by labeling their evaluations of Plaintiff as merely "self-reports [of] severe emotional issues." (*Id.* at 205.) That statement is inaccurate. Plaintiff's emotional lability was not merely self-reported by Plaintiff; rather it was based on Dr. Helfgott's and Dr. McCleary's personal observations, tests, and diagnosis of her MS related symptoms. In addition, as with Dr. Mendez and Dr. Sands, Dr. DeFilippis's report focused mostly on Plaintiff's "functionality" and failed to tailor the evaluation based on whether Plaintiff could "perform all the material duties" of her occupation, as required under the terms of the plan, and placed heavy emphasis on a few hours of surveillance showing Plaintiff running simple errands as evidence that she was not disabled. (*Id.* at 204–05.)

In sum, the Court finds that the peer reviews, as a whole, were of poor quality and failed to take into consideration important factors that clearly indicated that Plaintiff was disabled within the meaning of the plan. As such, this factor weighs in favor of finding an abuse of discretion.

#### b. Conducting an In–Person or Paper Review

Here, LINA based its decision to deny Plaintiff disability benefits based entirely on paper reviews by Dr. Sands, Dr. Mendez, and Dr. DeFilippis. *See Montour*, 588 F.3d at 630 (holding that paper review deserves less weight than an independent examination). It is evident from Dr. Helfgott's and Dr. McCleary's reports that Plaintiff's emotional lability and related conditions were symptoms best evaluated by an in person diagnosis. (*Id.* at 850–851, 225–232.) Indeed, as discussed above, Plaintiff expressly offered to submit to an examination by Defendant's doctors, but that offer was never accepted for reasons that are unclear from the present record. By failing to conduct any form of physical examination, this factor also weighs in favor of finding that LINA abused its discretion. *Montour*, 588 F.3d at 634 (holding that failing to conduct in person medical evaluations "raises questions about the thoroughness and accuracy of the benefits determination....")

#### c. Providing All Relevant Evidence to Independent Expert

Another relevant factor to find abuse of discretion is whether LINA provided all relevant evidence to an independent expert reviewer. *Id.* at 630. As discussed above, it appears from the Administrative Record that Dr. Mendez was not provided Dr. Helfgott's reports pertaining to Plaintiff's examinations from November to April of 2006. (A.R. at 220.) While Dr. Mendez notes that the medical records that he reviewed were not limited to those listed in his report, Dr. Mendez did include a list of materials that omitted any reference to Dr. Helfgott's earlier records. In these circumstances, the consequences of his failure to list them falls on LINA, not on Kreeger. Indeed, given the detailed listing of other materials, the

Court concludes that it is most likely that those documents are not included on the list because LINA failed to provide them. Thus, Dr. Mendez was not in a position to give proper consideration to all of Dr. Helfgott's findings regarding Kreeger's condition. This is of particular concern because Dr. Mendez was LINA's in house physician and thus can hardly be considered an "independent" reviewer. This factor also weighs in favor of finding abuse of discretion.

### d. Consideration of Contrary SSA Disability Determination

█ The Circuit's guidance suggests that courts conducting ERISA abuse-of-discretion review may also consider whether there has been an SSA determination contrary to the plan administrator's disability findings. *Montour*, 588 F.3d at 630. Here, similar to the facts of *Montour*, LINA failed to give any weight to the contrary SSA determination when deciding to terminate her disability benefits. *Id.* at 634–35. As explained in *Montour*, a "complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was 'the product of a principled and deliberative reasoning process.'" *Id.* at 635. Moreover, LINA's lack of consideration of the contrary SSA decision suggests that it was not interested in considering all relevant evidence and engaging in a principled and deliberative reasoning process. *Id.* (holding that "not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence.") (citation omitted). This factor weighs in favor of finding that LINA abused its discretion.

### e. Making A Decision Motivated by a Conflict of Interest

As noted in the discussion above, a structural conflict of interest "should prove more important" where circumstances "suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administer has a history of biased claims administration." *Id.* at 630–31. The conflict of interest is "less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias." *Id.* at 631.

Here, the record does not support the contention that LINA took steps to reduce potential bias, and the fact that LINA continued to investigate Plaintiff's disability claim in 2008 after the SIU Field Investigation nullified its initial fraud suspicions strongly suggests that the conflict had infected the benefits determination. (A.R. at 686); (Part B of A.R. at 9–10). On the contrary, as the discussion above indicates:

— one physician spent only a single hour reviewing the record and made a recommendation based on surveillance of a failed fraud investigation rather than a reasoned assessment of the relevant medical record;[1]

— LINA failed to present its in-house doctor with all of the relevant medical records;

— LINA failed to provide the physicians conducting the peer reviews the proper form for measuring Plaintiff's emotional and psychiatric functioning. (Chandler Decl. Regarding Extrinsic Evidence, Ex. D [Behavior Statement Form].)

— Dr. DeFilippis, who conceded that one suffering from IEED which he knew as "pseudobulbar affect" (PBA) would have no emotional control,[2] discounted

---

**1.** See *Montour*, 588 F.3d at 634 (finding it significant for the conflict of interest analysis that the physician conducting the paper review "overemphasized" a few hours of surveillance video.)

**2.** In deposition Dr. DeFilippis acknowledged

the diagnoses of Drs. Helfgott and McCleary for insufficient reasons and failed to undertake his own examination of Plaintiff;

— LINA refused to authorize an independent medical examination of Plaintiff;

— LINA refused to give any weight to the Social Security disability award;

Indeed, the facts surrounding the Social Security award are more than a little ironic. LINA promoted Kreeger's claim and provided her with assistance to present and prosecute the claim. Why? The answer is quite simple. To the extent that Kreeger received Social Security disability benefits, LINA's obligation under the disability plan was reduced. But when it came to giving any weight to the positive outcome of Kreeger's Social Security claim, LINA balked and refused to consider it. All of which goes to show that LINA's structural conflict infected its claim administration.

Finally, Kreeger sought to engage in a dialogue with LINA with the expectation that LINA would explain what information would be most pertinent to her claim. The Court cannot do better than repeat what Plaintiff said in her final appeal letter:

I am at a loss as to what additional information would be beneficial to you in this appeal. I have added a psychiatrist to my treating doctors and can provide a report from him but I fear it would be a waste of his time. I have repeatedly asked what it is you need to know and you have responded that I can submit whatever I like. This is not helpful. I have had several independent doctors

tell you that in their professional opinions I am no longer able to work as a result of a covered disability, also *I have offered to be examined by your doctors and you have refused that. What is it that you want?*

(*Id.* at 191) (emphasis added). LINA's refusal to identify what it needed to know to conduct its review of her appeal fell far short of a fiduciary's obligation to deal in utmost good faith with a plan participant. As Judge Kozinski noted in *Booton v. Lockheed Medical Ben. Plan*, 110 F.3d 1461 (9th Cir.1997), ERISA and its regulations contemplate a give and take between the administrator and a plan participant because "it's how civilized people communicate with each other regarding important matters." *Id.*, at 1463. Here LINA ignored its obligation to communicate openly with Kreeger, which is just one more indicator that its objective was to deny the claim, not seek a means of determining Kreeger's eligibility for benefits. Its conduct in this regard is further evidence that its decision-making was infected by the structural conflict of interest.

When balancing all of the *Montour* factors and viewing LINA's decision in light of the conflict of interest, the Court concludes that LINA's denial of long term disability benefits was an abuse of discretion.

## IV. CONCLUSION

Thus, based on the reasoning above, the Court finds in favor of Plaintiff and **ORDERS** her to submit a proposed final

that PBA is a manifestation of brain damage and that it can result from MS. (Depos., at 46–47.) He admitted to having "seen MS patients that who are severely impaired who had emotional outpourings that were probably due to organic factors and you could use that term." (*Id.* at 47.) The inability to con-

trol the emotions resulted from damage to the brain caused by the MS, and this brain damage causes the behavior; "it's not truly controlled by the person and doesn't reflect the true emotion or organic emotion." (*Id.* at 48.)

judgment consistent with this order by the close of business on **March 9, 2011.**

**IT IS SO ORDERED.**